LIBERTY NAT. BANK & TRUST CO.
OF LOUISVILLE, KY.

v.

UNITED STATES.

LIBERTY NAT. BANK & TRUST CO.
OF LOUISVILLE, KY. et al.

v.

UNITED STATES.

LANG v. UNITED STATES.

Civ. Nos. 2593, 2594, 2595.

United States District Court,
W. D. Kentucky, at Louisville.

July 7, 1954.

Samuel L. Greenebaum, Bernard Barnett, Greenebaum, Barnett and Carroll, Louisville, Ky., for plaintiffs.

Henry L. Spencer, Asst. to Atty. Gen., Washington, D. C., J. Leonard Walker, U. S. Atty., C. Rhodes Bratcher, Asst. U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, Chief Judge.

These cases were consolidated for the purpose of trial and heard by the Court without a jury on March 3, 1953. Since the trial was had, and on April 16, 1954, Karl H. Lang, plaintiff in Action No. 2593, and co-plaintiff in Action No. 2594, with his wife Elsie Ahrens Lang, died and the Liberty National Bank and Trust Company, Executor of the Estate of Karl H. Lang, Deceased, was substituted as plaintiff in each of said actions.

Upon the pleadings, exhibits, and the evidence adduced by the parties at the trial, the Court makes the following—

### Findings of Fact.

1. Each of the plaintiffs duly filed his or her income tax return for each of the years involved. In the returns, each plaintiff claimed a deduction for contributions made by him or her to the Louisville League of Women Voters, for the following years, in the following amounts:

| Year | Total | Husband | Wife | Joint |
|------|-------|---------|------|-------|
| 1946 | 4,194.29 | 184.64 | 4,009.65 | |
| 1947 | 5,100.00 | 2,550.00 | 2,550.00 | 3,305.00 |
| 1948 | 3,305 | | | |

The Commissioner disallowed all of the deductions claimed and restored the amounts thereof to net income. This resulted in the deficiencies in taxes and interest sought to be recovered in each of these cases, which were paid and claims for refunds thereof were timely filed.

2. In case number 2593, Karl H. Lang seeks to recover $2,884.60, with interest, representing a deficiency in income taxes paid for the years 1946 and 1947.

In case number 2594, Karl H. Lang and Elsie Ahrens Lang, husband and wife, seek to recover $1,521.44, with interest,

representing a deficiency in income taxes paid for the year 1948.

In case number 2595, Elsie Ahrens Lang seeks to recover $5,469.18, with interest, representing a deficiency in income taxes paid by her for the years 1946 and 1947.

3. The League of Women Voters of Louisville, Kentucky, is an unincorporated association organized in 1920. Its governing instrument is a set of by-laws, and the purpose of the organization, as set forth in its by-laws, in effect during the years 1946, 1947, and 1948 is "To Promote political responsibility through informed and active participation of citizens in Government". Its by-laws also provide that the League shall not support or oppose any political candidate.

4. The Louisville League is affiliated with the National League of Women Voters and the Kentucky League of Women Voters, the by-laws of which set forth their respective purpose to be "To Promote political responsibility through informed and active participation of citizens in Government." The National and State Leagues have no control over the activities of the Louisville League except that the Louisville League cannot carry on activities which are in conflict with the policies of the National and State Leagues.

No part of the net earnings of the Louisville League inures to the benefit of any private shareholder or individual.

5. The activities of the Louisville League in carrying out its purpose are (1) Voters Service activities, (2) Study and Discussion Groups, (3) Observation trips to the State Legislature, and observation trips to the Local and State Agencies to learn their operation and structure, (4) A Speakers Bureau or Committee, (5) Weekly luncheon meetings of the membership, (6) Periodic membership meetings and the annual membership meetings, (7) The holding of meetings open to the public, (8) Legislative activities and (9) Organizational activities.

6. In its Voters Service activities, the League expends much time and effort in attempting to get people to register and vote for the candidate of their choice. There are spot radio announcements, urging every one to register and vote, setting up of booths on the streets, manned by League members, who distribute handbills emphasizing the importance of registering and voting, questionnaires to the current candidates regarding the issues, and the answers which are published in the local papers without comment, open meetings with the candidates as speakers, panel meetings with the candidates, and posters placed in windows urging registration and voting.

7. The Study and Discussion groups are small groups, who meet weekly or biweekly throughout the year for the purpose of studying various topics concerning National, State and Local governments and other current issues to promote better understanding and the merits of the respective sides. The Study and Discussion groups have leaders responsible for the mechanics of this program and in general for the direction of this group. These groups visit governing officials and observe their operation and discuss it. After a given study has been concluded, the findings of the group are reported to the League's Board and to the membership at large.

These groups also meet for the purpose of self-education, the gathering and compilation of factual information, to be passed on to other civic organizations on request, and for the purpose of taking a stand on certain current issues, if desired.

8. The League, through its Speakers Bureau, furnishes speakers to various other civic organizations, when requested, who are well versed in the subject to be discussed, by reason of their study and discussion of the topic.

The League frequently takes a stand on issues of national or local import, and in support thereof, writes or wires mem-

bers of the Legislature, or executive branch of the Government, stating the League's stand on these issues. In some instances, the League has urged the legislators to take a certain stand on a question. The legislative activities of the League are sporadic, not continuing, depending upon the interest of the League in a specific issue.

9. During the year 1946, a substantial portion of the activities of the Louisville League was the carrying on of Study and Discussion groups relating to the operation and structure of the Louisville Departments of Health and Welfare, the City Hall, Louisville Board of Education and the Juvenile Courts. Also, during this year, there were various activities with reference to the Voters Service, including sponsoring of spot radio announcements, urging registration, and the setting up of nine booths in neighborhood shopping centers. During this year the League participated in the city-wide Famine Relief Campaign, including setting up and manning of ten booths in down town Louisville, where sixty members distributed information as to the conservation of food and aid in the program. Also much time, study and activity were given to opposing a bill in the State Legislature for repeal of the Civil Service Merit System for Louisville.

10. During the year 1947, the primary and substantial portion of the activities of the League was the carrying on of Study and Discussion groups in connection with the structure and operation of the local Board of Education, City finance, and a review of the work of the United Nations. The Voters Service activities were vigorously pursued, along with the usual organizational and internal activities, which included the carrying on of finance and membership drives, weekly luncheon meetings for the membership and the holding of the annual meeting in April of 1947. During this year, letters or wires were sent by officials of the League to Kentucky Senators and Congressmen concerning a Displaced Persons Bill, Federal Aid to Education, the Wool Tariff and the President's program for Stop-Gap Aid for Europe. The League also opposed a bill introduced in the State Legislature to require one pharmacist on the State Board of Health. The League also was active in its support for a revision of the State Constitution.

11. During 1948, the primary and substantial portion of the League's activities consisted of study and discussion of the structure and operation of the City Safety Department, the United Nations Charter and the specialized agencies of the United Nations, federal taxes and expenditures and fiscal policies.

Officials of the League contacted Senators and Congressmen, urging their position on the removal of tax on oleomargarine, home rule for the District of Columbia and Reciprocal Trade Agreements.

12. During the calendar years 1946, 1947 and 1948, the League had no legislative program, endorsed neither political party nor the candidates thereof and the only matters of proposed legislation in which the Louisville League participated were the approval or disapproval of the specific legislative matters named herein. The books and records of the League disclose the following disbursements thereof allocated to legislative expense:

| For Year Ended March 31st | Total Disbursements | Legislative Disbursements |
|---|---|---|
| 1946 | $ 6,431.49 | $49.50 |
| 1947 | 5,394.25 | 0 |
| 1948 | 7,719.97 | 12.60 |
| 1949 | 10,011.11 | 0 |

762

13. The activities of the Louisville League of Women Voters in the years involved were educational, were substantial in amount and constituted the vast bulk of the Louisville League's activities.

The legislative activities did not constitute a major or a substantial part of the League's activities during these years and were inconsequential and sporadic and not in pursuance of any legislative program of the League.

## Conclusions of Law.

I. The Court has jurisdiction of the subject matter and of the parties. Title 28 U.S.C. Section 1346(a) (1).

II. The issue here is governed by Section 23(o) (2) of the Revenue Act of 1934, and the Internal Revenue Code, 26 U.S.C. § 23(o) (2), which is as follows—

"§ 23. In computing net income there shall be allowed as deductions:
* * *

"(o) Charitable and other contributions. In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

"(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation
* * *"

Prior to 1934, the section did not include the language "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation", this being written into the law in the Revenue Act of 1934.

III. Although plaintiffs concede that some small part of the activities of the Louisville League during the years 1946, 1947, and 1948 constituted the carrying on of propaganda, or otherwise attempting to influence legislation, only a small part of such activities was of such nature, the primary activities being educational. No substantial part of the activities was the carrying on of propaganda, or otherwise attempting to influence legislation. No part of the net earnings of the League of Women Voters of Louisville inured to the benefit of any private shareholder or individual.

█ The exemption for charitable and educational gifts is liberally construed by the Courts. In the case of United States v. Proprietors of Social Law Library, 1 Cir., 102 F.2d 481, 483, the Court said—

"'The policy of exempting these corporations is firmly established and has been continuously expanding ever since the system of income taxation was adopted. The statute should be read, if possible, in such way as to carry out this policy and not to make the result turn on accidental circumstances or legal technicalities.' * * *

"'Any gift not inconsistent with existing laws which is promotive of science, or tends to the education, enlightenment, benefit, or amelioration of the condition of mankind, or the diffusion of useful knowledge, or is for public convenience, is a charity.'"

See also Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483, and Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246.

█ The deductibility of a contribution to the St. Louis League of Women Voters, an organization affiliated with the Missouri State League and the National League, was at issue in the case of Smith

v. Commissioner, 3 T.C. 696. The Court said—

"The purpose of the St. Louis League for Women Voters, according to its articles of incorporation, is to 'increase by means of education, the effectiveness of women's votes, in furthering better government'. Its constitution expresses its object in substantially the same language, with the additional sentence that the league, as an organization shall be strictly nonpartisan. It is affiliated with the National League of Women Voters, the object of which in 1939 was 'to promote political education through active participation of citizens in government.' Prior to 1938, one of the stated purposes of the national league was 'to promote * * needed legislation * * *' This was deleted from the constitution and bylaws in 1938. The St. Louis League is supported by minimum dues of $2. and contributions in excess of that amount. Its activities during 1939 consisted chiefly of conducting study groups on questions of the day and assembling and furnishing to its members and the public nonpartisan information on candidates for office. No substantial part of the activity of the league was for the purpose of influencing legislation. * * * Petitioner's contribution to the St. Louis League of Women Voters is deductible as a contribution to a corporation organized and operated exclusively for educational purposes."

In the case of Huntington National Bank v. Commission, 13 T.C. 760, there was involved the deductibility of a contribution to the Marion County Women's Clubs and in allowing the contribution, the Tax Court said—

"The carrying on of propaganda or otherwise attempting to influence legislation does not automatically disqualify the Federation under the statute. To disqualify it, such activities under the statute must constitute a 'substantial part of' its activities. * * * The fact that the Federation studies proposed legislation pertaining to the welfare of children and may have expressed its approval or disapproval thereof to its legislative representatives does not bar classification as an educational, literary, or charitable organization under the statute. Slee v. Commissioner, 2 Cir., 42 F.2d 184, 72 A.L. R. 400; Girard Trust Co. v. Commissioner, 3 Cir., 122 F.2d 108, 138 A.L.R. 448. There is no evidence that the Federation had any legislative program or disseminated controversial propaganda. Cf. Estate of John B. Sharpe, 3 T.C. 612, 621; affirmed 3 Cir., 148 F.2d 179, and Estate of Robert Marshall, supra, 2 Cir., 147 F.2d 75. This activity was only a minor one and not a substantial part of its activities."

The contributions here were for the most part made in order that the Louisville League of Women Voters would be able to establish a permanent meeting place or Club House and were in large measure used for that purpose.

In the case of Faulkner v. Commissioner of Internal Revenue, 1 Cir., 112 F.2d 987, 992, the taxpayer Mary Faulkner made a contribution to the Birth Control League of Massachusetts, with the understanding that the contribution was to be used exclusively for the League Sponsored Mothers' Health Offices, in which physicians gave advice to sick married women unable to afford the fee of a private physician. The Government contended that this gift was not deductible because the Mothers' Health Offices was controlled by the Birth Control League, which was a non-exempt organization and not organized exclusively for religious, charitable, scientific, literary, or educational purposes. The Court held that the League in 1935, the year in question, was organized and operated exclusively for charitable, scientific and educational purposes and that the contribution was deductible and said—

"Illegality aside, we have held that the League in 1935 was organized

and operated exclusively for charitable, scientific and educational purposes. This being so, we find no warrant in the language of section 23(o) (2) for the conclusion that a gift to the League in that year is rendered non-deductible because some feature of the League's activities, undertaken in good faith on advice of counsel, later turns out to have been in violation of a local penal law."

In this case, the Court also said—

"The exemption of income devoted to charity was a liberalization of the law in the taxpayer's favor 'begotten from motives of public policy' and 'not to be narrowly construed' ", citing Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246.

In the case of Commissioner of Internal Revenue v. Orton, 6 Cir., 173 F.2d 483, the Court decided that a Foundation, whose predominant purpose was the promotion of the science or art of ceramics, was exempt from income tax on the ground that it was organized and operated exclusively for scientific or educational purposes, where the profits produced from the manufacture and sale of ceramics were plowed back in furtherance of research and study in that field. See also Charles W. Dahlinger v. Commissioner, 20 B.T.A. 176.

In the case of Weyl v. Commissioner, 2 Cir., 48 F.2d 811, 812, the Board of Tax Appeals disallowed as a deduction contributions to the League for Industrial Democracy. The Court of Appeals in reversing the Board said—

"The League makes researches, gives lectures, holds debates and discussions, promotes, by writing pamphlets, books, and helping to distribute them, giving information concerning economic and social problems. It is well organized, has substantial sponsors, and claims to have a definite social doctrine. * * * The fact that its aim may or may not resemble that of a political party does not of itself remove it from the category of an association engaged in educational work. * * * It is clear that, as Congress did not intend to use the word 'education' in the statute in any exceptional sense, but giving it its plain, ordinary meaning, it is applicable to this appellant's contributions, and the deduction should have been allowed."

In the case of Cochran v. Commissioner, 4 Cir., 78 F.2d 176, 178, the taxpayer had contributed a large sum in 1929 to the World League Against Alcoholism and claimed this as a deduction. The Commissioner disallowed the deduction on the ground the World League was used to spread propaganda against alcoholism and was not an educational institution. The Board of Tax Appeals upheld the Commissioner, although it found—

"The League functions very much as an information bureau. One of the important features of its work is to collect statistical and historical data on the alcohol problem. The material collected is distributed among members organizations, the daily press, religious journals, and temperance publications. * * * The League distributed among its members both proprohibition and antiprohibition literature and also publications by brewers and distillers. * * * Members of the staff of the League as well as others also are sent out on speech-making trips in behalf of the League. On these trips some of the speakers express themselves as being opposed to the drink evil and advocating prohibition, while others content themselves with giving an impartial statement of the facts. * * * The League is supported by voluntary contributions, chiefly from individuals. It also receives contributions from its member organizations. No part of the net earnings of the League inures to the benefit of any private shareholder or individual."

The Board found, however, that the League was not during the year in question "an organization organized and op-

erated exclusively for educational purposes."

The Court of Appeals, in reversing the Board, said—

"Every finding of fact made by the Board supports the conclusion that the League was exclusively an educational institution, yet the Board reaches a conclusion different from that which is supported by its findings of fact, apparently because the constitution of the League, as originally organized, stated the object of the League to be to attain, by means of 'education and legislation,' the suppression of alcoholism. * * * The Board further found that the League collected and circulated information and acted very 'much as an information bureau' and circulated vast quantities of printed matter in public libraries and libraries of colleges and universities throughout the world and advised colleges and universities with respect to courses on the subject of alcoholism. Nothing could be more educational than this work. * * * The Board further found that the League collected and circulated information on both sides of the controversial question of the prohibition of the use of alcohol as a beverage and the Board found that the League as such was not opposed to the return of the open saloon, nor was it opposed to the drinking of all liquors. * * * That the laws governing the question here involved should be liberally construed in favor of the taxpayer is well settled."

Many of the functions of the Louisville League of Women Voters are similar to those in the World League in the collection and dissemination of information and literature on current problems (although the World League was concerned with only one); some members of the staff were loaned to other member organizations for speech-making purposes. The Louisville League of Women Voters had its members to make speeches at various meetings on current matters in which the League was interested. No part of the net earnings of either inured to the benefit of its members.

As authority for its position, the defendant cites the case of John H. Watson, Jr., v. Commissioner, 27 B.T.A. 463. In that case, the taxpayer had deducted from his income, a contribution made to the Citizens League of Cleveland, which the Board of Tax Appeals concluded was not a deductible contribution under the Statute. The objectives of this League, and those of the League of Women Voters are very similar, with the one outstanding difference that although both collect and disseminate information relative to local and state governments, induce citizens to take a more active interest in the affairs of government and encourage competent men and women to stand for public office, the Citizens League of Cleveland, after investigating candidates for office, classified such candidates as "preferred", "qualified", or "not recommended". The Citizens League of Cleveland also advocated the amendment of existing laws and its agents presented its recommendations in that respect to the legislative body. The Louisville League has on occasions wired or written legislators of the League's stand on a current issue and in some instances has urged the legislators to take a certain stand on a public question. It does not classify candidates as "preferred", "Qualified", or "not recommended". It did not ally itself with a political party or support any given candidate.

In the case of Henrietta T. Noyes v. Commissioner, 31 B.T.A. 121, also cited by defendant, the Board disallowed a deduction claimed by the taxpayer to the Minnesota League of Women Voters and one to the National League of Women Voters in 1930, the former being affiliated with the latter, on the ground that neither League was organized and operated exclusively for educational purposes within the meaning of Section 23 (n) (2) of the Revenue Act of 1928. Although the Board found "Education was undoubtedly one of the most important

purposes, probably the most important purpose, for which each of these leagues was organized and for which each was operated during 1930", it found that their purpose was also to "foster education in citizenship and to support needed legislation".

The case of United States v. Community Services, 4 Cir., 189 F.2d 421, 425, cited by defendant involved a corporation organized as a non-stock membership to operate a canteen refreshment service in the various plants of the Graniteville Company, which company on the date of the organization donated $25,000, and authorized the corporation to operate all concessions previously operated by the Graniteville Company. The corporation during the taxable period operated a canteen refreshment service, a coal and wood yard, a filling station and an electrical appliances store. Eighty-five percent of its gross receipts was derived from the sale of soft drinks, milk, sandwiches, candy and similar items to employees of Graniteville Company, the balance from the sale of coal, ice, gasoline and home appliances to Graniteville Company's employees and their families, no sales being made to the general public. All operations were conducted on properties owned by or leased from Graniteville Company. Taxpayer's officers and directors received no compensation. It employed about fifty persons, who received salaries. Its net profits in the years involved were contributed to charitable and educational institutions, with the exception of a reserve against taxes which might be due to the Government. The District Court held that the amount paid in employment taxes, for which refund claim was filed, was deductible on the theory that the taxpayer was organized and operated exclusively for charitable purposes. On appeal, the Circuit Court reversed and held that—

"Manifestly, a corporation engaged in commercial activities, if ex-empt from federal taxes, would have a tremendous economic advantage over competitors in the same field. Such a corporation could effectively eliminate competitors, actual and potential, since it could undersell corporations, whose earnings are subject to diminution by fedral taxation. It is difficult to believe that Congress intended to countenance such a situation. * * *

"It cannot be denied that in the case cited by taxpayer and those cited by the Government, both the decisions reached on the facts and the views expressed in the opinions are so varied and so divergent, that they cannot readily be reconciled."

In the case at bar, the Association was not operated for profit, nor under its by-laws could it have been so operated.

In urging the citizenship within the area of its influence to qualify as voters and to be informed upon the issues settled by exercise of the suffrage of the electorate, the League has rendered invaluable services in the fight against carelessness and indifference in public affairs. If upon sporadic occasions the zeal of its members has invaded the prohibited area of attempting to influence legislation, this becomes of little consequence viewed against the background of the whole of their efforts in behalf of better government.

It is therefore concluded that the contributions here involved were deductible as contributions by individuals for use of an association organized and operated exclusively for educational purposes, no part of which is carrying on propaganda or otherwise attempting to influence legislation.

Judgment for recovery of the taxes and interest in each case will be presented by counsel for plaintiffs upon notice to opposing counsel.